UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TA DEDICATED, INC. d/b/a TRANSPORT AMERICA and TFORCE TL HOLDINGS USA, INC. d/b/a TRANSPORTATION ENTERPRISE SERVICES,<br><br>Defendants. | CIVIL ACTION NO.  1:23-cv-1802<br><br>COMPLAINT<br><br>JURY TRIAL DEMAND |

NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex and unlawful retaliation and to provide appropriate relief to Kristopher Neville and Gary Pugh.  As alleged with greater particularity below, Defendants TA Dedicated, Inc. d/b/a Transport America and TForce TL Holdings USA, Inc. d/b/a Transportation Enterprise Services engaged in sex discrimination when they subjected Neville and Pugh to an unlawful hostile work environment and discharge or constructive discharge because of sex orientation.  Defendants also unlawfully retaliated against Neville and Pugh for engaging in protected activity.

JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

1

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division.

3. EEOC reasserts as if fully set forth herein the allegations below at Paragraphs 5-6, 8, 23, and 28-30.

PARTIES

4. Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

5. Defendant TA Dedicated Inc. d/b/a Transport America ("Transport") is a trucking company that provides dedicated truckload services throughout the United States, including throughout the state of Ohio and Cuyahoga County and other counties within the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division.

6. At all relevant times, Transport, a Minnesota corporation, has continuously been doing business in the State of Ohio and has continuously had at least 15 employees.

7. At all relevant times, Transport has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

8. At all relevant times, Defendant TForce TL Holdings, USA, Inc. d/b/a Transportation Enterprise Services ("TES"), a Delaware corporation, has continuously been doing business in the State of Ohio and has continuously had at least 15 employees.

9. At all relevant times, TES has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

10. At all relevant times, TES, or one of its wholly-owned subsidiaries, has been the 100% owner of Transport.

11. At all relevant times, both Transport and TES have been wholly owned, either directly or indirectly, by TFI International, Inc ("TFI International").

12. Transport maintains a publicly available website that identifies it as "A TFI International Company" and links to TFI International's website.

13. In providing services to and on behalf of Transport, TES employees have used email signatures that identify TES as "A TFI International Company."

14. TES president Alain Bedard serves on the board of directors of Transport.

15. Bedard also is the Chairman of the Board, President, and CEO of TFI International.

16. Josiane Langlois serves as secretary for both Transport and TES.

17. Langlois also is the Vice-President, Legal Affairs and Corporate Secretary of TFI International.

18. Transport President Eric Anson is listed on TFI's publicly available website as part of the TFI "Operating Team."

19. TFI Vice President, Human Resources, Sylvain Desaulniers; TFI Vice President, Real Estate, Norman Brazeau; and TFI Vice President, Insurance & Compliance, Chantal Martel, also serve as vice presidents of Transport.

20. At all relevant times, Transport and TES have shared office space at 1715 Yankee Doodle Road in Eagan, Minnesota.

21. At all relevant times, Transport and TES also have shared office space at 4701 East 32nd Street in Joplin, Missouri.

22. In or around December 2019 and January 2020, Transport's human resources personnel, including human resources management, transferred employment from Transport to TES.

23. At all relevant times after January 2020, TES provided human resources and leave administration services to and on behalf of Transport, including but not limited to investigating complaints of discrimination, harassment, and retaliation; approving employee requests for leave and extensions of leave; participating in employee termination decisions; and representing Transport before the Commission, including before the Commission's Cleveland Field Office.

24. At all relevant times after January 26, 2020, Ryan Winegardner was an employee of TES.

25. Prior to January 26, 2020, Winegardner was an employee of Transport.

26. As an employee of TES, Winegardner provided human resources services to and on behalf of Transport, including but not limited to investigating complaints of discrimination, harassment, and retaliation and participating in employee termination decisions.

27. At all relevant times, each named Defendant has functioned as an employer, or Defendants have functions as an integrated enterprise or joint employers.

## ADMINISTRATIVE PROCEDURES

28. More than thirty days prior to the institution of this lawsuit, Charging Party Kristopher Neville filed a charge with the Cleveland Field Office of the United States Equal Employment Opportunity Commission alleging that he was subjected to unlawful harassment and

discrimination because of his sex orientation and was subjected to retaliation for engaging in protected activity, in violation of Title VII, at the Transport shop in North Jackson, Ohio.

29. Defendants appeared before the Cleveland Field Office of the United States Equal Employment Opportunity Commission, presented their response and alleged defenses to the charge, and submitted to the Cleveland Field Office a position statement and employment records, by and through their regional director of human resources and their counsel.

30. On March 2, 2022, the Cleveland Field Office of the United States Equal Employment Opportunity Commission issued to Defendants a Letter of Determination finding reasonable cause to believe that Title VII was violated and inviting Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

31. After engaging in communications with Defendants concerning the employment discrimination described in the Letter of Determination, the EEOC was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

32. On June 9, 2022, the EEOC issued to Defendants a Notice of Failure of Conciliation advising Defendants that the Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

33. All conditions precedent to the initiation of this lawsuit have been fulfilled.

STATEMENT OF CLAIMS

34. Since at least 2018, Defendants have engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1). The alleged unlawful employment practices include, but are not limited to, the following:

35. On or about April 3, 2018, Defendants hired Pugh to work as a mechanic at Defendants' shop in North Jackson, Ohio.

36. Pugh is a gay male.

37. On or about December 17, 2018, Defendants hired Neville to work as a mechanic at the North Jackson shop.

38. Neville is a gay male.

39. Throughout Neville and Pugh's employment, Gary Everhart, Billy McMurray, and other personnel of Defendants frequently called Neville and Pugh "faggot" and "queer" and subjected them to other unwelcome, derogatory remarks relating to sex or sex orientation, including but not limited to repeatedly taunting Pugh, saying "I heard you're a faggot;" telling Pugh, "Eat a dick. Oh wait, you like dick; go eat a pussy instead;" cutting in front of Neville at the time clock, saying, "I don't want faggots touching it before me;" putting notes in Neville's toolbox, lunch bag, and on his car referring to him as "faggot;" telling Neville to stay away in case being gay "jumps" from person to person and "you're queer; I don't want to be queer like you;" and commenting to Neville that the only reason Neville knew how to fix something was because he "like(s) playing with long, hard shafts."

40. During Pugh's employment, he was subjected to unwelcome and inappropriate physical contact because of his sex orientation when a lead mechanic, Harley Williams, shoved his finger against Pugh's pants near his anus. When Pugh objected, Williams stated, "I know you like it."

41. During Neville's employment, he was subjected to physical violence because of his sex orientation. Everhart, a lead mechanic at the time, snatched a work order from Neville's hands and pushed him, saying, "get your faggot ass away from me," and threatening to beat Neville up.

6

42. During Neville's employment, Defendants' employees repeatedly defaced Neville's uniform shirts, adding the letters "ty" to the name patch to change "Kris" to "Kristy" and writing in large print on the back of one shirt, "I suck cock 4 cash."

43. On one occasion during Neville's employment, McMurray handed Neville heterosexual pornographic DVDs and told Neville to watch them so he could turn straight.

44. Neville reported this incident to shop manager, Shenard Gordon, and another employee turned in the DVDs to Gordon after being subjected to similar conduct, but shortly thereafter, Gordon returned the DVDs to McMurray and they remained in full view of other shop employees for several days.

45. During Neville's employment, Neville repeatedly complained to Gordon about the sex-orientation harassment.

46. Gordon repeatedly told Neville not to take his reports of harassment to human resources and that Gordon would take care of it himself, but the harassment continued and worsened.

47. When Neville complained about Everhart's abuse in April 2019, Transport's human resources representative interviewed Neville about his complaint and Neville reported the sex-orientation harassment Everhart had subjected him to, but Defendant did not take effective action to stop the harassment or prevent it from recurring.

48. During Pugh's employment, Pugh complained to Defendants' human resources representative about the sex-orientation harassment, but Defendant did not take effective action to stop the harassment or prevent further harassment as a result of his complaint either.

49. After Neville and Pugh reported sex-orientation harassment to Transport's human resources representative, Gordon held meetings with shop employees in which he told them there

had been too many instances of reports to human resources by Neville and Pugh, and Gordon repeatedly warned shop employees not to complain to human resources, threatening that the next person who did so would lose their job.

50. After Neville and Pugh made reports about the sex-orientation harassment, the harassment continued and worsened, and Gordon and others took action against them that a reasonable worker would find materially adverse.

51. After Pugh complained to human resources about the sex-orientation harassment, Gordon and others falsely accused Pugh of saying he was going to "make" Williams gay.

52. Pugh complained to human resources about the false accusation and reminded human resources about the past sex-orientation harassment he had suffered at Transport.

53. Human resources delayed investigating Pugh's complaint for weeks and then deemed it to be "he said, she said" and failed to take effective action to stop the ongoing harassment.

54. Within one week after human resources dismissed Pugh's complaint as "he said, she said," Williams, who had previously touched Pugh inappropriately as detailed above, falsely accused Pugh of grabbing his butt.

55. Human resources investigated Williams' allegations immediately, including confronting Pugh with them.

56. At that point, Pugh had been discriminated and retaliated against to the point where he reasonably felt compelled to resign, and Pugh put in his two weeks' notice.

57. Before Pugh's notice period ran, one of his regular harassers accused Pugh of calling another employee a "snitch," and Defendants fired Pugh for purported "unprofessional conduct," even though other mechanics had engaged in more serious conduct without termination.

58. After Neville spoke to human resources about Everhart's abuse and continued to complain about ongoing harassment to Gordon, Defendants' employees repeatedly stole, damaged, or destroyed Neville's personal property, including but not limited to stealing or throwing away his lunches, keying and spitting on Neville's car, filling Neville's shoe with grease, and damaging Neville's toolbox cover and tool cart.

59. After Neville spoke to human resources about Everhart's abuse and continued to complain about ongoing harassment to Gordon, Gordon began to send Neville home for purported lack of work while others continued working with heavy workloads.

60. On one occasion, the day after Neville reported on-going harassment to Gordon, a threatening note appeared in Neville's toolbox.

61. The following week, Gordon made Neville paint curbs and poles in the rain while other employees watched and called out, "that's what you get for being a narc."

62. Gordon became increasingly hostile towards Neville, and in March 2020, Gordon threatened Neville that if Gordon heard or saw Neville talking to anyone, Neville would be fired.

63. In late March 2020, Neville requested a leave of absence, which Defendants approved.

64. In April 2020, while Neville was on leave, Gordon changed Neville's regular schedule to one that Gordon knew Neville could not work due to family obligations.

65. Thereafter, on or about April 17, 2020, Neville complained to human resources about the ongoing harassment and retaliation he had been subjected to and stated that he would go to EEOC if Defendants did not resolve the problem.

66. Neville's complaint was assigned to Defendants' human resources representative, Ryan Winegardner.

67. Neville told Winegardner about the harassment and retaliation he had suffered, including but not limited to the fact that he had been called a "faggot" and a "queer;" that coworkers said he "suck[ed] guys dicks for money;" that nothing was done because Gordon said he "can't have drama no more;" and that now he was "being threatened and punished," including Gordon threatening to fire him and changing his shift.

68. Winegardner described Neville's sex-orientation harassment complaints as "secondary concerns" and did not investigate them.

69. On May 1, 2020, Winegardner told Neville he could not substantiate his allegations and closed the investigation.

70. On June 5, 2020, while Neville was still on an approved leave of absence, Defendants falsely accused Neville of job abandonment and terminated his employment.

71. Gordon made the decision to terminate Neville's employment in consultation with Winegardner.

72. Following Pugh and Neville's terminations, Defendants continued to subject them to actions that a reasonable worker would find materially adverse.

73. Following their terminations, Transport refused to return Pugh and Neville's personal tools and toolboxes to them until police intervened.

74. When a mechanic finally brought Neville's toolbox to the shop gate, the mechanic pushed it through the gate and said, "we don't help faggots load their tools."

75. In or about Spring 2021, Gordon further subjected Pugh to materially adverse action by interfering with his subsequent employment with a different company.

76. Defendants subjected Neville and Pugh to a hostile work environment based on sex orientation in violation of Title VII, when it subjected them to a work environment permeated with

harassment based on their sex orientation, including but not limited to the incidents described in paragraphs 34-71 above.

77. The sex-orientation harassment was perpetrated by Defendants' non-supervisory and supervisory personnel.

78. Defendants were on notice of the sex-orientation harassment because Neville and Pugh opposed it and complained about it, the harassment was open and obvious to supervisory personnel, and supervisory personnel participated in the harassment.

79. Defendants failed to exercise reasonable care to prevent and correct promptly any sex-orientation harassment.

80. The sex-orientation harassment culminated in Pugh's termination or constructive discharge and in Neville's discharge.

81. Defendants discriminated against Pugh because of his sex orientation, in violation of Title VII, when it constructively discharged him or fired him for pretextual reasons as described in paragraphs 34-57 above.

82. Defendants subjected Pugh to such intolerable discriminatory conduct that a reasonable person in his position would have felt compelled to resign.

83. Pugh gave two-weeks' notice of his resignation.

84. Defendants then fired Pugh for pretextual reasons.

85. Defendants discriminated against Neville because of his sex orientation, in violation of Title VII, when it fired him for pretextual reasons as described in paragraphs 34-71 above.

86. Defendants engaged in unlawful retaliation against Neville and Pugh in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) when Defendants took action against them because they engaged in protected activity, as described in paragraphs 45-75 above.

87. During Neville and Pugh's employment, they opposed and/or complained about sex-orientation harassment.

88. Defendants unlawfully retaliated against Neville and Pugh because they engaged in protected activity by taking action that a reasonable worker would find materially adverse or that would dissuade a reasonable worker from making or supporting a charge of discrimination, including but not limited to threats of termination and/or harm, false accusations, unfavorable and/or humiliating assignments, termination of employment, interference with or damage or destruction of personal property, and interference with subsequent employment.

89. The effect of the practices described above has been to deprive Neville and Pugh of equal employment opportunities and otherwise adversely affect their status as employees because of their sex orientation and protected activity.

90. The unlawful employment practices described above were intentional.

91. The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of Neville and Pugh.

PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in sex-orientation discrimination and retaliation for having engaged in activities protected by Title VII.

B. Order Defendants to institute and carry out policies, practices, and programs that provide equal employment opportunities to persons who have been harassed because of their sex-orientation and that eradicate the effects of Defendants' past and present unlawful employment practices.

C. Order Defendants to institute and carry out policies, practices, and programs that provide equal employment opportunities to persons who avail themselves of Title VII protected activities and that eradicate the effects of Defendants' past and present unlawful employment practices.

D. Order Defendant to make whole Neville and Pugh, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to reinstatement and front pay in lieu thereof.

E. Order Defendants to make whole Neville and Pugh by providing compensation for past and future pecuniary losses resulting from the unlawful employment pageactices described above, in amounts to be determined at trial.

F. Order Defendants to make whole Neville and Pugh by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices described above, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

G. Order Defendants to pay Neville and Pugh punitive damages for Defendants' malicious and reckless conduct, as described above, in amounts to be determined at trial.

H. Grant such further relief as the court deems necessary and proper in the public interest.

I. Award the Commission its costs of this action.

JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

                Respectfully submitted,

                U.S. EQUAL EMPLOYMENT OPPORTUNITY
                COMMISSION
                Washington, D.C.

                GWENDOLYN Y. REAMS
                Acting General Counsel

                DEBRA M. LAWRENCE
                Regional Attorney
                Philadelphia District Office

                KATE NORTHRUP
                Assistant Regional Attorney

                s/ Jessi Isenhart
                JESSI ISENHART
                Senior Trial Attorney
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
                COMMISSION
                Cleveland Field Office
                1240 E. 9th Street, Suite 3001
                Cleveland, OH 44199
                jessi.isenhart@eeoc.gov
                Phone: 216-306-1121
                PA Bar No. 206504